Calvin SIMS et al., Plaintiffs,

v.

PARKE DAVIS & CO., a Michigan Corporation, et al., Defendants.

Civ. A. No. 31172.

United States District Court,
E. D. Michigan, S. D.

Jan. 5, 1971.

Robert L. Segar, Flint, Mich., for plaintiffs.

Timothy Carroll, Dykema, Gossett, Spencer, Goodnow and Trigg, Detroit, Mich., for Parke Davis & Co.

Wolfgang Hoppe, Miller, Canfield, Paddock & Stone, Detroit, Mich., for The Upjohn Co.

Solomon Bienenfeld, Asst. Atty. Gen., Lansing, Mich., for State of Michigan.

MEMORANDUM OPINION

RALPH M. FREEMAN, Chief Judge.

Plaintiffs were convicted of crimes under the laws of Michigan and are serving, or have served, terms in the State Prison of Southern Michigan, at Jackson, Michigan, (hereafter referred to as Jackson Prison). Two of the defendants, Parke Davis & Company and The Upjohn Company, are private corporations engaged in the interstate manufacture of drugs. A third defendant, the Department of Corrections of the State of Michigan, has "exclusive jurisdiction over * * *: (c) penal institutions * * * prison labor and industry * * *" Mich.Com.Laws § 791.204. The defendants Eleanor Hutzel, James E. Wadsworth, Ernest C. Brooks, Max Biber, C. J. Farley, John W. Rice, Duane L. Waters, Florence Crane, Joseph J. Gross and G. Robert Cotton are, or were, members of the Michigan Corrections Commission which supervises the Department of Corrections. Mich.Com.Laws §§ 791.201–791.203. The defendant Gus Harrison is Director of the Department of Corrections. Jurisdiction is based upon Title 29 U.S.C. § 216(b); Title 28 U.S.C. §§ 1337, 1343; and Title 42 § 1983.

The background facts giving rise to the present complaint are not in dispute.

In November of 1963 the Michigan Department of Corrections entered into two separate agreements with defendant Upjohn Company and defendant Parke Davis & Company. Pursuant to those agreements, each drug company was permitted to construct, at its own expense, " * * * a Clinical Research Building at the State Prison of Southern Michigan." Both buildings were subsequently completed and, under the terms of the contracts, became "the property of the State of Michigan," with the defendant drug companies retaining the right to use the buildings they constructed "for clinical research so long as clinical research is conducted by any organization or corporation at the State Prison of Southern Michigan."

The "clinical research" presently carried on in those buildings involves the testing of drugs on volunteers among the Jackson inmates. The plaintiffs, however, and the class plaintiffs seek to represent, were not used as subjects in drug experiments; instead, they performed various services in connection with the operation of the clinics. Those services were grouped together under the following job classifications:

### Parke Davis & Company

| Classification: | Services Performed: |
| --- | --- |
| Chief Clerk | Preparation of prison details |
| Clerk | Double check labels |
| Chief Cook | Cooking and other kitchen duties |
| Head Porter | Janitor and Messenger |
| Maintenance Man | Maintenance and minor repairs |
| Porter and Nurse Supervisor | Night Janitor and Attendant |

### The Upjohn Company

| Classification: | Services Performed: |
| --- | --- |
| Chief Technician | Performs specific tasks such as operation of EEG machine |
| Technician | Same as above |
| Technician Trainee | Same as above |
| Chief Clerk | Clerical tasks |
| Clerk | Clerical tasks |
| Nurse Supervisor | Acts as nurse in connection with clinical tests |
| Nurse | Same as above |
| Chief Cook | Cooks and serves food |
| Cook | Same as above |
| Kitchen | Assists in kitchen |
| Kitchen Pot and Pan | Assists in kitchen |
| Maintenance Man | Maintenance and minor repairs |
| Head Porter | Janitorial tasks |
| Porter | Janitorial tasks |

Plaintiffs allege that they, as well as other Jackson inmates, were forced by "defendants Parke Davis & Company and The Upjohn Company in conjunction with representatives of the Michigan Department of Corrections" to work in those classifications "on a regular basis up to as much as one hundred twelve (112) hours per week" at wages ranging "from Thirty-Five Cents ($0.35) to One Dollar and 25/100 ($1.25) per day."

On the basis of these allegations, plaintiffs conclude in Count I of their amended complaint that they are entitled to recover from the defendant drug companies the difference between the compensation received for their labor and the minimum wage prescribed by the Fair Labor Standards Act of 1938 (FLSA), as amended, 29 U.S.C. § 201 et seq. In Count II of their amended complaint, plaintiffs contend that if the Fair Labor Standards Act is found to be inapplicable, then plaintiffs are entitled to recover from the defendant drug companies the difference between the compensation they received for their labor and the minimum wage as prescribed by the Michigan Minimum Wage Law of 1964, Mich.Com.Laws § 408.381 et seq.

Count III of the amended complaint alleges that the utilization of the plaintiffs' labor by the drug companies is illegal under Section 800.305 Mich.Com. Laws and "has resulted in * * * the unjust enrichment of Defendants [drug companies] in the amount by which the reasonable value of Plaintiffs' services exceeds the amount paid by Defendants to Plaintiffs." Plaintiffs also contend in Count III that the "Defendants other than Parke Davis & Company and The Upjohn Company have been unjustly enriched * * * from the illegal use of Plaintiffs' labor by the acquisition for the State Prison of Southern Michigan of a building (i. e., the structure housing the clinic.)".

In Count IV, plaintiffs allege that "the illegal utilization * * * of Plaintiffs' labor by all Defendants and the payment by Defendants Parke Davis & Company and The Upjohn Company

of nominal wages less than those required by law" has resulted and is resulting in: (1) deprivation of the property of plaintiffs without due process of law; (2) the holding of plaintiffs in involuntary servitude contrary to the Thirteenth Amendment to the Federal Constitution; and (3) the denial to plaintiffs of equal protection of laws as guaranteed by the Fourteenth Amendment. For these alleged violations of their Constitutional rights, plaintiffs seek one million dollars in damages from defendants.

Plaintiffs have now filed a motion for summary judgment on Count III. The defendants Upjohn Company and Parke Davis Company have, in turn, filed motions for summary judgment on Counts I, III, IV; a motion to dismiss Count II as failing to state a claim upon which relief can be granted; and a motion for an order that plaintiffs' action cannot be maintained as a class action. Defendant Department of Corrections, its Director, and the members of the Corrections Commission have also filed a motion to dismiss the complaint as to them. All of these motions are now before the court.

PARKE DAVIS AND UPJOHN'S MOTION FOR AN ORDER THAT PLAINTIFFS' SUIT CANNOT BE MAINTAINED AS A CLASS ACTION

In their complaint, plaintiffs state:

"There are numerous other people who either are or have been inmates in the State Prison of Southern Michigan at Jackson, Michigan, who have the same cause of action as hereinafter set forth on the part of the named Plaintiffs, and the named Plaintiffs adequately represent such unnamed people. This action is brought pursuant to Rule 23A of the Federal Rules of Civil Procedure on behalf of all such people whose number make it impractical to have them join as Plaintiffs. The named Plaintiffs adequately represent said class."

Defendant Upjohn Company, however, has filed a motion for an order declaring

that the present case cannot be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure.

Rule 23 requires a plaintiff who wishes to bring a class action to overcome two hurdles. First, he must satisfy all the conditions of Rule 23(a), which are:

"(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

■ After satisfying the court that all the conditions of Rule 23(a) have been met, the litigant must establish that his action is appropriate under one of the three subdivisions of Rule 23(b). Rule 23(b) provides that:

"(b) * * * An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any question affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

Once a plaintiff has demonstrated that his suit comes within the requirements of Rule 23, he can then pursue the action not only on his own behalf, but also on behalf of all other persons similarly situated, although those persons are not parties to the litigation.

■■ Claims for minimum wages under the Fair Labor Standards Act, however, cannot be maintained as a class action under Rule 23. That is because 29 U.S.C. § 216(b) limits the binding effects of a judgment adjudicating rights under the FLSA to persons who have filed a written consent to become parties to the suit:

"Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. Action to recover such liability may be maintained in any court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. *No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.* * * "

(Emphasis added.) 29 U.S.C. § 216 (b).

Hence, plaintiffs concede that since Count I of their complaint alleges a claim under the FLSA, it cannot be maintained under Rule 23, and those inmates not filing written consents can neither benefit from nor be bound by any judgment rendered on Count I.

Nevertheless, plaintiffs contend that Counts II, III and IV of their complaint are maintainable as a Rule 23 class action. Yet assuming Rule 23, rather than 29 U.S.C. § 216(b), is applicable to the remaining Counts, as plaintiffs argue, the requirements of that rule have not been met.

The first prerequisite to a Rule 23 action is a class " * * * so numerous that joinder of all members is impracticable * * *." 23(a) (1). The resolution of what constitutes "impracticability" depends " * * * upon all the circumstances surrounding a case. * * * Courts should not be so rigid as to depend upon mere numbers as a guideline to the practicability of joinder." Demarco v. Edens, 390 F.2d 836, 845 (2nd Cir. 1968).

■ ■ On the other hand, while the number of prospective class members is not determinative of the impracticability of joinder: " * * * it is a significant factor to be considered." Fidelis Corp. v. Litton Industries, Inc., 293 F. Supp. 164, 170 (S.D.N.Y.1968); accord, Philadelphia Electric Co. v. Anaconda American Brass Company, 43 F.R.D. 452 (E.D.Pa.1968). But that factor cannot be examined in the present case, for plaintiffs have failed to even allege the approximate size of the class they seek to represent. Instead, their pleadings merely contain the conclusory statement that "there are numerous other people who * * * have the same cause of action * * *" and " * * * whose number make it impracticable to have them join as plaintiffs." The only information this court has been given on class size was supplied by plaintiffs' attorney during oral argument, when he commented that the class would probably contain between 70 and 200 persons. Since this estimate was unsupported by any materials before the court, it must be deemed purely speculative, and speculation cannot be used to establish that a prospective class is so numerous as to make joinder impracticable under the surrounding circumstances. Demarco v. Edens, supra, 390 F.2d at 845; Matthies v. Seymour Mfg. Co., 23 F.R.D. 64, 75 (D.Conn.1958), rev. on other grounds, 270 F.2d 365 (2nd Cir. 1959); See, Lucas v. Seagrave Corp., 277 F.Supp. 338, 348 (D.Minn.1967).

Because more than speculation as to class size is required for a court to determine if the requirement of 23(a) (1) is met does not mean, however, that plaintiffs have to establish class size with precision. It simply means that some information must be presented by plaintiffs from which the approximate number of class members can be ascertained before the court can decide if joinder of all those members would be impracticable.

■ Since plaintiffs have failed to show that the requirement of 23(a) (1) has been satisfied, Counts II, III, and IV are not maintainable as a class action. Thus, defendants' motion for an order declaring those Counts cannot be pursued as a class action is granted, subject to possible revision if plaintiffs later demonstrate that their suit complies with Rule 23(a) (1). Defendants' motion for a similar order that Count I cannot proceed as a Rule 23 class action is also granted for the reasons previously stated.

## MOTION FOR SUMMARY JUDGMENT ON COUNT I FILED BY DEFENDANT DRUG COMPANIES

In Count I of their amended complaint, plaintiffs allege that they are entitled to recover from defendant drug companies the difference between the amounts plaintiffs received for their labor in the research clinics and the minimum wage, plus overtime compensation,

prescribed by the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 et seq. Defendant drug companies have moved for summary judgment on this Count pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, which provides:

"The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Plaintiffs maintain that there are genuine issues of material fact to be decided in Count I, and, thus, under Rule 56(c), defendants' motion for summary judgment must be denied. Defendants, on the other hand, contend that the affidavits they have filed, as well as their answers to interrogatories, are uncontroverted by sworn testimony submitted by plaintiffs and must, therefore, be viewed as presenting undisputed facts. It is defendants' position that on those facts the applicable law entitles them to judgment.

Although the parties disagree on the factual posture of Count I, they are in accord that the only question of law raised by this Count is whether plaintiffs are "employees" of either defendant within the meaning of the Fair Labor Standards Act. That Act, as amended, defines "employee" as:

" * * * any individual employed by an employer, except that such term shall not, for the purposes of subsection (u) of this section include—

(1) any individual employed by an employer engaged in agriculture if such individual is the parent, spouse, child, or other member of the employer's immediate family, or

(2) any individual who is employed by an employer engaged in agriculture if such individual (A) is employed as a hand harvest laborer and is paid on a piece rate basis in an operation which has been, and is customarily and generally recognized as having been, paid on a piece rate basis in the region of employment, (B) commutes daily from his permanent residence to the farm on which he is so employed, and (C) has been employed in agriculture less than thirteen weeks during the preceding calendar year." 29 U.S.C. § 203(e).

An employer is defined as:

" * * * any person acting directly or indirectly in the interest of an employer in relation to an employee but shall not include the United States or any State or political subdivision of a State (except with respect to employees of a State, or a political subdivision thereof, employed (1) in a hospital, institution, or school referred to in the last sentence of subsection (r) of this section, or (2) in the operation of a railway or carrier referred to in such sentence), or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization." 29 U.S.C. § 203(d).

To employ, in turn, means " * * * to suffer or permit to work." 29 U.S.C. § 203(g).

A literal application of those definitions contained in the Act would, as the parties note, "encompass all employed humanity." Walling v. Sanders, 136 F.2d 78, 80 (6th Cir. 1943). For this reason, courts have been forced to devise a more meaningful test to determine when an employment relationship exists within the meaning of the FLSA. That test is one of "economic reality," [Goldberg v. Whitaker House Cooperative, Inc., 366 U.S. 28, 33, 81 S.Ct. 933, 6 L.Ed.2d 100 (1960)] and is not limited to the technical concepts " * * * pertinent to an employer's legal responsibility to third persons for acts of his servants." United States v. Silk, 331 U.S. 704, 713, 67 S.Ct. 1463, 1468, 91 L.Ed. 1757 (1946).

Plaintiffs do not contest the applicability of the economic reality test to Count I of their complaint, but instead allege that this test involves considerations of a peculiarly factual nature which preclude summary judgment treat-

ment. Plaintiffs, however, have failed to cite any legal authority to support their contention that summary judgment is inappropriate in cases raising the question of whether an employment relationship exists under the FLSA. And while the United States Supreme Court in *Kennedy v. Silas Mason Company,* 334 U.S. 249, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948), did vacate a summary judgment where that very issue was involved, the Court specifically noted that summary disposal would have been proper if the record had presented " * * * a more solid basis of findings * * * or * * * a comprehensive statement of agreed facts." 334 U.S. at 257, 68 S.Ct. at 1034.

Subsequent to the *Kennedy* decision, the District Court for the Eastern District of Texas summarily adjudicated rights under the Fair Labor Standards Act, after finding the defendants were not independent contractors. The Fifth Circuit Court of Appeals affirmed on the ground that the uncontroverted facts before the lower court were sufficient to warrant its ultimate finding:

" * * * that appellee was not an independent contractor. * * * A reasonable inference fairly deduced from an uncontroverted * * * number of facts may establish the existence of an ultimate fact that entitles one of the parties to judgment as a matter of law. When this happened, as it did in this case, and summary judgment is sought, Rule 56(c) requires that 'judgment * * * shall be rendered forthwith.'" Creel v. Lone Star Defense Corp., 171 F.2d 964, 968 (5th Cir. 1948), rev'd on other grounds, 339 U.S. 497, 70 S.Ct. 755, 94 L.Ed. 1017 (1950).

Under *Kennedy, supra,* and the reasoning of the Fifth Circuit Court of Appeals, defendant drug companies would be entitled to summary judgment if the present record contains sufficient uncontroverted facts from which this court can conclude that in economic reality plaintiffs are not "employees" of defendants. On the other hand, if the sworn testimony on material facts is contradictory, or

if the record does not contain a sufficiently comprehensive picture of plaintiffs' relationship to defendants, then defendants' motion for summary judgment must be denied.

■ In deciding whether the inmates working at the Jackson research clinics are, in economic reality, employees of defendants, both parties agree that the court must consider the extent to which defendants can hire, fire and control those inmates. *Walling v. Sanders, supra.* It is the position of defendants that they can exercise only limited control over the inmates and that they have no authority over hiring and firing. To support their contentions, defendants have filed the affidavit of George A. Kropp, Warden of the State Prison of Southern Michigan.

In his affidavit, Warden Kropp swears that the Director of Prison Treatment, acting with the prison Classification Committee, determines every work assignment of inmates, including assignments to the research clinics. The Director of Treatment and the Classification Committee, however, will consider requests from Parke-Davis and Upjohn for the assignment of certain inmates, although prison officials can place inmates at work in the clinics over the objections of the drug companies.

Moreover, according to Warden Kropp, the Director of Treatment is similarly responsible for the removal of inmates from their work assignments and has removed inmates from clinic assignments without the knowledge or approval of the drug companies. As in the case of assignments, the drug companies may request that the Director of Treatment remove particular inmates from the research clinics, but those requests can be denied. Finally, Warden Kropp maintains that his Deputy Warden has the power to disapprove the hours worked and the particular tasks performed by inmates on all work assignments and has exercised that power in the case of certain inmates assigned to the clinics.

The defendant Upjohn Company has also introduced the affidavit of Ralph F.

Willy, Administrator of the Upjohn clinic at Jackson. Willy's affidavit is to the same effect as Warden Kropp's and states that: (1) inmates were in some instances assigned by the prison Classification Committee to perform specific tasks at the Upjohn clinic, although the clinic had no need for additional help; (2) inmates assigned to the Upjohn clinic took time off from their tasks pursuant to prison rules without the approval of their Upjohn supervisor; (3) specific instructions by Upjohn personnel to inmates were sometimes vetoed by prison authorities; and (4) requests by Upjohn filed with the Classification Committee to remove inmates from the clinic were in some instances denied.

The answers to interrogatories of both Upjohn and Parke-Davis, which may be examined in a summary judgment proceeding, further buttress the affidavits of Willy and Kropp. According to those answers, neither drug company was ever permitted to select an inmate for assignment to the research clinic (Interrogatory Answer No. 6); the prison authorities could require the companies to keep an inmate working in the clinic over drug company objections (Interrogatory Answer No. 16); and the hours worked by inmates assigned to the clinics were regulated by prison authorities (Interrogatory Answer No. 13).

Plaintiffs' attorney, however, contends that defendants' affidavits and interrogatory answers concerning clinic assignments and the direction of the clinic work force are controverted by sworn testimony submitted by plaintiffs. Thus, plaintiffs conclude that Count I must be tried since summary judgment proceedings cannot be used to resolve a conflict among affidavits. Yet, an examination of the materials filed by plaintiffs in opposition to the summary judgment motion fails to reveal such a conflict.

The affidavit of Gaylord Lee Espich, which plaintiffs allege contradicts Upjohn's sworn testimony that it did not select the inmates to work in the clinic, cannot be considered by the court. As Upjohn correctly notes, Rule 56(e) requires affidavits " * * * be made on personal knowledge, * * * and show affirmatively that the affiant is competent to testify to the matters stated therein." While affiant Espich states he is competent to testify from personal knowledge that "the Upjohn Company, personally approved all inmates who worked in the said clinic and persons could not work there that were not so approved," his competency and firsthand knowledge of these facts is unsupported by anything contained in his affidavit. Espich does not, "in his affidavit or otherwise reveal how he knew these facts. * * * Inasmuch as summary judgment procedure lacks the safeguard of cross-examination of an affiant, it is important that it be shown that he is competent to testify to the matters therein stated." American Security Co. v. Hamilton Glass Co., 254 F.2d 889, 893–894 (7th Cir. 1970); *Accord*, Green v. Benson, 271 F.Supp. 90 (E.D.Pa.1967). Indeed, since Espich is simply one of the inmates who worked in the Upjohn laboratory, it is difficult to see how he could be competent to testify from firsthand knowledge on whether Upjohn "personally approved all inmates who worked" in its clinic. Hence, that portion of Espich's affidavit referring to Upjohn's selection of inmates will be stricken as failing to conform with Rule 56(e).

Plaintiffs' attorney has filed four other affidavits of Jackson inmates, Boyd Slager, Clemont M. DeDeaux, Chester A. Sawicki, and Calvin Sims, who worked in the research clinics and who are parties to the present suit. Portions of those affidavits support, rather than contradict, defendants' sworn testimony that prison authorities, not the drug companies, selected the inmates for work in the research clinics.

*Affidavit of Boyd Slager:*

"9. Affiant was placed in the Upjohn Clinic for purposes of work by the following method:

"In June of 1964, while working in the Main Hall Office of the State

Prison of Southern Michigan as a Count Clerk on the Night Shift. Affiant was offered or made aware of an opening in the Upjohn Medical Research Clinic, located inside the Walls of the Prison, by the then Inmate Clerk, John Dutz. I then requested and was granted an interview with the Clinic Administrator, Mr. Ralph F. Willy. After that interview, a request was made to the Prison Classification Director Mr. Schmeige (now retired), and in the fore part of July 1964 I was taken before the Classification Committee and it was decided that the Prison Officials had no objection to the transfer and it was approved, provided that I stayed on to help break another Inmate in on the Main Hall Office job. This was done and in August of 1964, an Assignment Change Order was signed by Mr. G. L. Hansen, Director of Treatment, indicating that I was to go to work at the Upjohn Clinic. On August 19, 1964, I started work at the clinic on a full time basis which continued until July 1967."

*Affidavits of Clemont M. DeDeaux, Chester A. Sawicki, and Calvin Sims:*

"6. He and others working at the clinics did so because they were ordered to do so by representatives of the Department of Corrections just as they would be ordered to work in any other prison industry and a refusal to work as directly would have resulted in penalties to them and such coercion and threat, was under the circumstances, clearly implied if not expressly stated."

The affidavits of Sims, DeDeaux, Sawicki, and Slager also say that the affiants "worked directly under the supervision of civilian employees of the drug companies." According to plaintiffs' attorney, those statements contradict defendants' sworn testimony concerning the drug companies' lack of control over inmates assigned to the clinics. Defendants, however, admit that their agents directly supervised the inmates in the day-to-day performance of clinic work (Defendants' Brief on Count I, p. 4), and the affidavits submitted by defendants do not claim to the contrary. Rather, those affidavits indicate that defendants' day-to-day supervision over inmates was always subject to the overriding authority of prison officials, who frequently exercised their authority to disapprove the drug companies' instructions to inmates. Hence, the fact that clinic inmates were supervised in the routine performance of their tasks by defendants is simply another uncontroverted fact for the court to consider in analyzing the extent to which defendants actually control the inmates working in the clinic.

Finally, plaintiffs' attorney maintains that a letter co-signed by Upjohn and Parke-Davis officials and referring to the "hiring" of inmates at the research clinics contradicts defendants' sworn testimony on the drug companies' inability to select inmates for work in the clinics. [Exhibit G–1, letter signed by J. P. Conlin of Parke-Davis and R. Willy of Upjohn]. We cannot agree with plaintiffs on this point. To show there is a material fact in dispute on the present summary judgment motion, plaintiffs must produce a factual description of the procedures by which defendants acquire inmate help, and such description must be different from the one presented by defendants' affiants. The word "hiring" is not a factual description, but simply a shorthand notation that is often used by businessmen to connote any variety of procedures resulting in the attainment of a work force.

Moreover, the letter containing the reference to hiring is only one in an exhibit of many letters signed by drug company personnel or by prison officials, which plaintiffs have submitted for our examination. [Defendants have stipulated to the court's consideration of that entire exhibit for the purposes of the present motion.] The content of those letters, when read together, indicate that even though defendants' personnel might occasionally refer to the hiring of inmates, the assignment of inmates to the

clinics was determined by prison authorities. [See, e. g., Exhibit G–4 and A–5].

Having carefully reviewed all the admissible affidavits, documents, and interrogatories submitted by both parties, this court concludes that the following facts have been established by uncontroverted sworn testimony: (1) prison officials, not the drug companies, decide which inmates will work in the clinics, and inmates have been assigned to the clinics despite the disapproval of the drug companies; (2) prison authorities, not the drug companies, determine when inmates will be removed from their assignment to the clinics, and inmates have been so removed without the approval of the drug companies; (3) the particular tasks performed by inmates working in the clinics must be approved by prison officials; (4) the hours worked by inmates are subject to the approval of prison officials; (5) inmates working in the clinics may be given time off from their tasks by prison officials without the consent or knowledge of defendant drug companies; (6) the inmates are supervised by defendant drug companies in the day-to-day performance of their work at the clinics. From these uncontroverted facts, the court must conclude that neither Upjohn nor Parke-Davis had the right to hire or fire inmates, and that the companies' supervision of inmates' work performance was always subject to final control by prison officials.

But the fact that defendants could not hire, fire or finally control inmates working in the clinics is not determinative on the issue of whether plaintiffs are employees of the drug companies under the economic reality test. The entire fabric of plaintiffs' relationship to the companies must be considered.

A comprehensive picture of that relationship, excluding the elements already discussed, is presented by defendants' answers to interrogatories, portions of Warden Kropp's affidavit, and the parties' judicial admissions. They establish that plaintiffs are, or were, lawfully convicted criminals, serving sentences in Jackson prison. As prisoners, plaintiffs were ordered by prison authorities to perform services for defendant drug companies, just as they would be ordered to work in any other prison industry. Those services, which have previously been described, were performed inside the prison walls in a clinic operated by the drug companies and owned by the State of Michigan. Plaintiffs were paid for their services to the drug companies by the Department of Corrections at per diem rates established by the Department. The drug companies, in turn, reimbursed the Department for its payments to inmates working at the clinics. The drug companies never contracted with the inmates for the payment of compensation.

A case involving an almost identical relationship between prisoners and a private corporation was decided under the Fair Labor Standards Act by the Federal District Court for the Western District of Michigan in 1948. That case, Huntley v. Gunn Furniture Company, 79 F.Supp. 110 (W.D.Mich.1948), also had certain inmates of Jackson Prison as plaintiffs claiming to be entitled to the Federal Minimum Wage.

In *Huntley*, plaintiffs alleged that the Michigan Corrections Commission entered into a contract with defendant, a private manufacturing corporation, whereby the State of Michigan would supply defendant with a convict labor force to work on the assembly of shell casings. Pursuant to that contract, plaintiffs were allegedly assigned to work in the prison stamping plant upon those shell casings. According to the complaint, plaintiffs' work was supervised by prison employees, who were paid by the defendant and who were under the defendant's direction. Plaintiffs further alleged that defendant reimbursed the State of Michigan for the inmates' per diem compensation, which was paid by the State of Michigan.

On the basis of the above allegations, Judge Starr dismissed the prisoners' complaint, saying:

" * * * the complaint in the present case fails to allege facts showing that plaintiffs were employees of the

defendant within the meaning of the words 'employ' and 'employee' as used in the Act [Fair Labor Standards Act]. In fact, the complaint affirmatively shows that the plaintiffs were employees of the Michigan prison industries and not of the defendant. In view of this conclusion, it is unnecessary to determine the question of the validity of the contract between the defendant and the prison industries." 79 F.Supp. at 116.

Plaintiffs, however, would distinguish the *Huntley* case from the present suit because here the defendant drug companies exercised a degree of supervision over inmates assigned to the clinics, while in *Huntley*, only prison employees directed the convict work force. To distinguish the cases on this ground would ignore the allegation in *Huntley* that the prison employees who supervised the inmates in their work in the stamping plant were "under the supervision and direction of the defendant." 79 F.Supp. at 112. Since those allegations had to be accepted as true for the purposes of the motion to dismiss, the *Huntley* court was required to assume that the defendants' agents supervised plaintiffs in their routine work at the stamping plant. That assumption corresponds to the uncontroverted facts now before the court.

■ In our opinion, Judge Starr's decision that the prisoners there were not employees of the defendant manufacturing corporation within the meaning of the FLSA was correct. Similarly, in our case, we believe that the economic reality of the present situation, based on uncontroverted facts, requires a finding that the present plaintiffs are not employees of the defendant drug companies.

The economic reality is that plaintiffs are convicted criminals incarcerated in a state penitentiary. As state prisoners, they have been assigned by prison officials to work on the penitentiary premises for private corporations at rates established and paid by the State. In return for the use of this convict labor, the private corporations have relinquished their normal rights: (1) to determine when, and whether, their enterprises need additional help; (2) to select the members of their work force; (3) to remove from their work force members with whom they are dissatisfied; (4) to control that labor force except in the most routine matters. To find on those facts that an employment relationship exists between the prisoners and private corporations is contrary to the economic reality of their relationship.

Moreover, we do not think that Congress intended the Fair Labor Standards Act to cover the present situation. The setting of wages for incarcerated prisoners working on assignment by prison officials requires the consideration of many variables which are unique to that situation and which directly affect government policy on rehabilitation of criminals. It is unlikely that Congress considered any of those variables at the time it adopted general legislation designed to give employees the right to a subsistence wage. Fair Labor Standards Act, 81 Cong.Rec. 7652, 7672, 7885; 82 Cong.Rec. 1386, 1395, 1491, 1505, 1507; 83 Cong.Rec. 7283, 7298, 9260, 9265. See also H.Rep. No. 1452, 75th Cong. 1st Sess., p. 9; S.Rep. No. 884, 75th Cong., 1st Sess., pp. 3–4. Congress has, however, recognized the possibility of convict labor being used to compete with the free labor market and made it a crime to:

"(a) * * * knowingly transport in interstate commerce * * * any goods, wares, or merchandise manufactured, produced, or mined, wholly or in part by convicts or prisoners, except convicts or prisoners on parole or probation, or in any penal or reformatory institution, * * *.

"(b) This chapter shall not apply to * * * commodities manufactured in a Federal District of Columbia, or State institution for use by the Federal Government, or by the District of Columbia, or by any State or Political subdivision of a State." 18 U.S.C. § 1761.

Nevertheless, the court does not now hold that any prisoner who is assigned

by prison officials to perform work for a private corporation on the penitentiary premises is, because of his prisoner status, outside the coverage of the Fair Labor Standards Act. We only find that on the present facts plaintiffs are not in economic reality employees of defendant drug companies as that word is defined in the Act. Hence, defendants' motion for summary judgment on Count I is granted.

## DEFENDANT DRUG COMPANIES' MOTION TO DISMISS COUNT II

■ In Count II, plaintiffs set forth a claim under the Michigan Minimum Wage Law of 1964, Mich.Com.Laws, § 408.381 et seq. That claim involves allegations identical to those contained in Count I of the complaint and is before the court under its pendent jurisdiction; Siler v. Louisville and Nashville R. Co., 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909); Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933); United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Defendants Upjohn and Parke–Davis have filed a motion to dismiss Count II for failing to state a claim upon which relief can be granted under the Michigan Minimum Wage Law. The Michigan Minimum Wage Law, Section 14, provides:

> "The provisions of this act shall not apply to any employer who is subject to the minimum wage provisions of the federal fair labor standards act of 1938, as amended, except in any case where application of such minimum wage provisions would result in a lower minimum wage than provided in this act * * *." M.S.A. § 17.255(14), M.C.L.A. § 408.394.

Defendants contend that under this language, the Michigan Minimum Wage Law is inapplicable to the present suit because both drug companies, as interstate manufacturers, are jurisdictionally subject to the Fair Labor Standards Act of 1938, which act provides for higher wages than the Michigan law. Plaintiffs,

on the other hand, would construe Section 14 to mean only that employers who are required to pay the federal minimum wage under the FLSA are not subject to the Michigan Minimum Wage Law, provided the federal wage rate is the higher of the two. Hence, if a Michigan employer were jurisdictionally subject to the FLSA, due to the interstate nature of its enterprise, but were excused from paying the federal minimum wage rate for some reason, then that employer would be subject to the Michigan Minimum Wage Law.

■ Neither plaintiffs nor defendants have cited any cases in support of their respective constructions of Section 14. It would seem, however, that public policy favors plaintiffs on this point. The narrower construction defendants advocate would permit Michigan employers who escape paying the federal minimum wage to also escape paying the Michigan minimum wage. Such a result is not required under the doctrine of federal pre-emption.

■ Yet while the court holds that defendant drug companies are jurisdictionally subject to the Michigan Minimum Wage Law, it further finds plaintiffs are not employees within the meaning of that word as defined in the Act:

> " 'Employee' means an individual between the ages of 18 and 65 years employed by an employer on the premises of the employer or at a fixed site designated by the employer." M.S.A. § 17.255(2) (b), M.C.L.A. § 408.382 (b).

Employ, in turn, means " * * * to engage, suffer or permit to work." M.S.A. § 17.255(2) (d), M.C.L.A. § 408.-382(d).

Although those definitions, enacted in 1964, have never been construed, the Michigan Supreme Court has ruled that the common law test of a master-servant relationship is not determinative of whether one person is employed by another under the State's Workmen's Compensation Act and Employment Security

Act. Instead, the Michigan Supreme Court directed that in deciding if an employment relationship exists, " * * * for the purpose of remedial social legislation, * * *" the total factual situation surrounding the relationship must be examined; the test is one of "economic reality." Goodchild v. Erickson, 375 Mich. 289, 293, 134 N.W.2d 191, 193 (1965); Tata v. Benjamin Muskovitz Plumbing & Heating, 354 Mich. 695, 699, 94 N.W.2d 71 (1959); Foster v. Mich. Employment Security Commission, 15 Mich.App. 96, 99–101, 166 N.W.2d 316 (1968).

 Since the Michigan Minimum Wage Law is remedial legislation, the reasoning of the Michigan Supreme Court under the Employment Security Act and the Workmen's Compensation Act would apply equally as well to it, and the entire fabric of plaintiffs' relationship to defendants must be examined in determining whether plaintiffs are, in economic reality, employees of defendants within the meaning of the Michigan Minimum Wage Law. But the court has already made such an examination under Count I and decided on the affidavits submitted by the parties that plaintiffs are not employees of defendants within the meaning of the Fair Labor Standards Act. Since the economic reality test is likewise applicable to plaintiffs' claim under the Michigan Minimum Wage Law, defendants are similarly entitled to summary judgment on Count II. Thus, the court will treat defendants' motion to dismiss Count II as one for summary judgment under Rule 12(c) which provides:

"If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, * * *" Rule 12(c) F.R.Civ.P.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON COUNT III; DEFENDANT DRUG COMPANIES' CROSS-MOTION FOR SUMMARY JUDGMENT ON COUNT III; MOTION TO DISMISS FILED BY DEFENDANT DEPARTMENT OF CORRECTIONS, THE DIRECTOR OF THE DEPARTMENT OF CORRECTIONS, AND MEMBERS OF THE CORRECTIONS COMMISSION.

 Count III of the amended complaint alleges a claim for damages under Michigan law which involves factual allegations similar to those raising a federal question in Count IV and is before the court under its pendent jurisdiction. In Count III, plaintiffs state that their services were utilized by defendant drug companies pursuant to agreements between the drug companies and the Michigan Department of Corrections which are illegal under Section 5 of the Michigan Prison Industries Act, 210 P.A. 1935, Com.Laws 1948, § 800.-305:

"* * * nor shall labor of prisoners be sold, hired, leased, loaned, contracted for or otherwise used for private or corporate profit or for any other purpose than the construction, maintenance or operation of public works, ways or property as directed by the governor; * * *" (§ 28.1525 M.S.A.)[1]

Because of the alleged illegality of those labor contracts under Section 5, plaintiffs conclude that they have a cause of action under Michigan law, in either tort or implied contract, for the reasonable value of their services against the defendant drug companies, the defendant Department of Corrections, its Director and the individual members of the Corrections Commission.

Plaintiffs have now moved for summary judgment on Count III, while defendant drug companies have filed a

1. Section 5 of the Michigan Prison Industries Act, 210 P.A.1935, Com.Laws 1948, § 800.305, is now Section 6 of the Michigan Correctional Industries Act, 15 P.A. 1968, Com.Laws, § 800.326.

cross-motion for summary judgment on this Count. In addition, defendant Department of Corrections, its Director, Gus Harrison, and the individual members of the Michigan Corrections Commission have filed a motion to dismiss Count III on the ground that plaintiffs have failed to state a claim entitling them to relief. Since, however, that motion to dismiss has been accompanied by another affidavit of Warden Kropp, the court will treat it as one for summary judgment under Rule 12(c), which provides:

"If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, * * *" Rule 12(c) F.R.Civ.P.

The question raised by the above motions is whether on the uncontroverted facts, as already discussed in Count I, any of the parties are entitled to judgment as a matter of Michigan law. Those facts are:

1. Plaintiffs are or were legally incarcerated in Jackson Prison (Plaintiffs' Stipulation on Oral Arguments).

2. Pursuant to contracts between defendant drug companies and defendant Department of Corrections, the latter "furnished labor" to the drug companies for use in the research clinics built by the companies in the prison, but owned by the State of Michigan. (Plaintiffs' Brief of October 30, 1969, p. 3).

3. The plaintiff inmates worked in the clinics by order of the Department of Corrections just as "they would be ordered to work in any other prison industry." (Plaintiffs' Brief of October 30, 1969, p. 4).

4. Defendant drug companies paid certain sums to the State of Michigan for the labor of the inmates assigned to the clinics, according to monthly charges made by the Department of Corrections. (Plaintiffs' Brief of October 30, 1969, p. 5). On those facts defendants maintain that even if the labor contracts were illegal under Section 5 of the Michigan Prison Industries Act, plaintiffs do not have a cause of action against any of the defendants for the reasonable value of their services, and that defendants are, therefore, entitled to judgment as a matter of Michigan law.

Although no Michigan court has ever decided whether a violation of Section 5 of the Michigan Prison Industries Act gives rise to a claim for damages, we believe that such a violation by defendants would not, on the present facts, create a cause of action for money damages in favor of plaintiffs. Instead, that Act authorizes criminal prosecution as the remedy for its willful violations:

"Violations. Sec. 14. Wilful violation of any of the provisions of this act by an officer of the state or of any political subdivision thereof, or by any officer of any institution of either, shall be sufficient cause for removal from office; and such officer shall also be subject to prosecution as hereinafter provided." M.S.A. § 28.1534, M.C.L.A. § 800.314.[2]

"Penalty. Sec. 15. Any person, firm or corporation who shall wilfully violate any of the provisions of this act, shall be deemed guilty of a misdemeanor and, upon conviction thereof, shall be punished by a fine of not less than 100 dollars nor more than 500 dollars, or by imprisonment in the county jail for a period of not more than [90] days, or by both fine and

---

2. Section 14 of the Michigan Prison Industries Act is now Section 13 of the Michigan Correctional Industries Act, which provides:
"Wilful violations of any of the provisions of this act by an officer of the state or of any political subdivision

thereof, or by any officer of any institution of either, shall be sufficient cause for removal from office, and subject such officer to prosecution as provided in section 14." Com.Laws, § 800.333, M.S.A. § 28.1540(13).

imprisonment, at the discretion of the court." M.S.A. § 28.1535, M.C.L.A. § 800.315.[3]

While an action for damages may be inferred from a criminal statute even though that statute does not expressly authorize a civil damage suit, nevertheless it is generally recognized that a plaintiff must first demonstrate he falls within the class of persons the criminal statute was intended to protect before he can base a civil action for damages on a violation of criminal law. Wyandotte Transportation Co. v. United States, 389 U.S. 191, 202, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967).

 Section 5 of the Michigan Prison Industries Act, however, was never intended to protect inmates incarcerated in Michigan prisons from being compelled to perform services for private corporate profit. Rather, the primary purpose of that Section is, in pertinent part:

"(c) to eliminate all competitive relationships between prisoner labor * * * and free labor * * *."
Section 10, Michigan Prison Industries Act, Com.Laws, § 800.310(c), M.S.A. § 28.1530.[4]

Hence, it is the work force outside the prison walls, not prison inmates, that the Michigan legislature was attempting to protect by the enactment of Section 5. Since plaintiffs are not the intended beneficiaries of Section 5, they cannot pursue an action for damages based on a violation of that Section.

 There is a second reason why plaintiffs cannot recover damages from defendants on the present facts. That is because defendants' allegedly illegal utilization of plaintiffs' labor did not, as plaintiffs contend, deprive them of any property to which they were entitled. Instead, the thrust of the Michigan Prison Industries Act[5] is that the labor of inmates lawfully incarcerated in Michigan penitentiaries and working on the order of prison officials belongs to the State, rather than to the inmates. This construction of the Act earlier received the approval of the Federal District Court for the Western District of Michigan in Huntley v. Gunn Manufacturing Co., supra, when Judge Starr concluded on almost identical facts:

"[i]t is clear that the labor of the plaintiffs as inmates of the State prison belonged to the State of Michigan." 79 F.Supp. at 113.

Since plaintiffs had no right to their own labor, or to its fruits, at the time they were ordered to perform the services they now challenge as being illegal, plaintiffs are not entitled to recover the reasonable value of those services under any theory of action recognized by Michigan law.

Plaintiffs, however, would have the court construe Section 5 of the Michigan Prison Industries Act as conferring on inmates the right to the fruits of their labor when that labor has been illegally used, through no fault of the inmates, in competition with private industry. But, as already noted, the purpose behind the enactment of Section 5 was to protect the free labor market, not to give incarcerated criminals any rights regarding the disposition of their labor.

The only case suggesting that a violation of a state statute regulating the uses of prison labor may create an action for damages in favor of the prisoners

---

3. Section 15 of the Michigan Prison Industries Act is now Section 14 of the Michigan Correctional Industries Act, which provides:
 "Any person, firm or corporation who willfully violates any of the provisions of this act is guilty of a misdemeanor."
 Com.Laws, § 800.334, M.S.A. § 28.1540 (14).

4. Section 10 of the Michigan Prison Industries Act is now Section 11 of the Michigan Correctional Industries Act, Com.Laws, § 800.331, M.S.A. § 28.1540 (11).

5. The Michigan Prison Industries Act, 210 P.A.1935, Com.Laws, §§ 800.301–800.319, has been repealed by the Michigan Correctional Industries Act, 15 P.A.1968, Com.Laws. §§ 800.321–800.335. The 1968 Act, however, is substantially identical in content to the 1935 Act.

whose labor was unlawfully used is *Sloss Iron and Steel Company v. Harvey,* 116 Ala. 656, 22 So. 994 (1897). In *Sloss,* the Alabama Supreme Court denied the plaintiff prisoners' claim for relief *ex contractu,* but said, in dicta, that defendants' acts in extracting work from the prisoners on Sunday, in violation of a statute prohibiting such Sunday labor, was tortious. Yet, *Sloss* is distinguishable from the present situation because there the court found that the law prohibiting Sunday labor by prisoners, " * * was enacted for the benefit of the convict," 116 Ala. at 657, 22 So. at 994.

Since Section 5 of the Michigan Prison Industries Act was not intended to protect inmates, and since plaintiffs as inmates have not been deprived of any property belonging to them under Michigan law by defendants' utilization of their labor, the court concludes that defendants are entitled to judgment on the stipulated facts. Summary judgment will, therefore, be entered for defendants on Count III.

DEFENDANT DRUG COMPANIES' MOTION FOR SUMMARY JUDG-MENT ON COUNT IV AND MO-TION TO DISMISS FILED BY DE-FENDANT DEPARTMENT OF CORRECTIONS, ITS DIRECTOR, AND THE MEMBERS OF THE MICHIGAN CORRECTIONS COM-MISSION

In Count IV of their complaint, plaintiffs ask for money damages under 42 U.S.C. § 1983, alleging that the "illegal utilization * * * of plaintiffs' labor by all the Defendants and the payment by Defendants Parke, Davis and Company and the Upjohn Company of nominal wages less than those required by law" has resulted in: (1) the deprivation of plaintiffs' property without due process of law as required by the Fourteenth Amendment; (2) the holding of plaintiffs in involuntary servitude contrary to the Thirteenth Amendment to the Federal Constitution; and (3) the denial to plaintiffs of equal protection of laws as required by the Fourteenth Amendment. Defendant drug companies have moved for summary judgment on this count. In addition, the Michigan Department of Corrections, its Director, and the members of the Michigan Corrections Commission have filed a motion to dismiss Count IV as failing to state a claim entitling plaintiffs to relief. That motion to dismiss will be treated as one for summary judgment for the reasons already discussed under Count III.

The facts relevant to a determination of the present motions are those previously enumerated under Count III, and some additional facts established by uncontroverted statements in an affidavit of Warden Kropp. According to Warden Kropp: (1) inmates performing labor in the research clinics are paid at somewhat higher daily rates than are inmates performing similar labor in other prison industries; (2) the recreational facilities and, at times, the food available to inmates working in the research clinics are superior to the recreational facilities and the food available to prisoners working in other prison industries; (3) inmates working in the research clinics are given more freedom by prison authorities than are inmates working in most other prison industries. On these facts, defendants maintain that they are entitled to a judgment as a matter of law. We agree.

Plaintiffs' claim that their work in the research clinics constitutes a form of involuntary servitude is without merit. Lawfully convicted criminals may be required to work by prison authorities for: "There is no federally protected right of a state prisoner not to work while imprisoned after conviction * * *. [t]his is not the sort of involuntary servitude which violates Thirteenth Amendment rights." *Draper v. Rhay,* 315 F.2d 193, 197 (9th Cir. 1963). Indeed, the Thirteenth Amendment expressly excepts punishment for a crime from its prohibitions against involuntary servitude:

"Neither slavery nor involuntary servitude, except as punishment for crime whereof the party shall have

been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."

Since plaintiffs do not maintain that they were illegally convicted, their claim that they have been held in involuntary servitude by defendants is groundless.

■■ On oral argument, plaintiffs' attorney indicated that the due process and equal protection claims raised by Count IV are based wholly on the alleged unlawfulness under Michigan law of defendants' utilization of plaintiffs' labor. As we now understand the legal argument underlying Count IV, it is that a violation of the Michigan statute prohibiting competition between prison labor and free labor automatically deprives the prisoners whose labor is used contrary to this mandate of their Fourteenth Amendment rights.

Yet, merely because penal officials have treated state prisoners at variance with the applicable state law does not, in itself, constitute a violation of the due process or equal protection rights of those prisoners. That was the precise conclusion reached by the Courts of Appeal for the Eighth and Ninth Circuits in two decisions which we elect to follow. Draper v. Rhay, 315 F.2d 193, 197 (9th Cir. 1963); Sigler v. Lowrie, 404 F.2d 659, 662 (8th Cir. 1968). If the rule were otherwise, every erroneous decision on state law matters would come before the federal court as a Constitutional question. Hughes v. Heinze, 268 F.2d 864, 870 (9th Cir. 1959).

■ But even if the allegations in Count IV are construed more broadly than plaintiffs' attorney suggested on oral argument, they still do not present a cause of action under 42 U.S.C. § 1983 for the denial of due process rights. To raise such a claim, those allegations, or the facts already established, must indicate that plaintiffs have been deprived of some fundamental Constitutional right which follows them into their prison cells.

"Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a with-drawal which is justified by the considerations underlying our penal system. To argue that the incarcerated person can only be incarcerated and not be deprived of the average person's ordinary rights as he would have had them if the prisoner were not convicted and sentenced and confined is, as a matter of common ordinary logic, absurd. It is only where fundamental, humane and necessary rights are breached that the constitutional protections become involved." Ray v. Commonwealth of Pennsylvania, 263 F.Supp. 630, 631 (W.D.Pa.1967).

A failure, however, to pay plaintiffs for their labor in the clinics at its reasonable value is not a denial of such a fundamental Constitutional right. Sigler v. Lowrie, supra, 404 F.2d at 661.

■■ Plaintiffs have likewise failed to contend that defendants purposefully discriminated against them, as opposed to other prisoners in the same class, when defendants allegedly used prison labor contrary to Section 5 of the Michigan Prison Industries Act. That purposeful discrimination is a necessary element in the present case under the equal protection clause of the Fourteenth Amendment:

"Appellant asserts * * * that he is being improperly held in the state penitentiary, and that in accordance with state law he should be in the county jail * * *. No denial of equal protection is shown unless there is shown intentional or purposeful discrimination between persons or classes." Draper v. Rhay, supra, 315 F.2d at 198.

Moreover, the uncontroverted facts already discussed show that the effects of the alleged violation of Michigan law was to confer tangible benefits on inmates like plaintiffs who received clinic assignments, for they received higher wages, more freedom, and labored under better working conditions than did the inmates performing similar work but in different prison industries.

In view of the above findings, it is unnecessary to determine whether defend-

ants have, in fact, violated Section 5 of the Michigan Prison Industries Act or whether each defendant has acted under color of law sufficient to subject it to liability under 42 U.S.C. § 1983. Rather, we hold only that even if defendants used plaintiffs' labor contrary to Michigan law, and even if defendants acted under color of state law in so doing, plaintiffs have suffered no denial of federally protected rights. For this reason, defendants' motions for summary judgment on Count IV are granted.

Appropriate orders may be submitted.