### HUNTLEY et al. v. GUNN FURNITURE CO.
#### Civ. A. No. 1004.

District Court, W. D. Michigan, S. D.
July 13, 1948.

Kurt J. Kremlick, of Detroit, Mich. (Howell Van Auken, Fred J. Schumann and Lucking, Van Auken, Schumann & Greiner, all of Detroit, Mich., of counsel), for plaintiffs.

Edward C. McCobb, Robert A. Johnson, John W. Cummiskey and McCobb, Heaney & Dunn, all of Grand Rapids, Mich., for defendant.

STARR, District Judge.

At all times material to the issues in this case plaintiffs were inmates of the State prison of southern Michigan at Jackson, Michigan, and were serving prison sentences imposed by the courts of that State. Defendant is a Michigan corporation with its principal office and place of business at Grand Rapids, Michigan.

On March 11, 1947, plaintiffs filed complaint in pursuance of section 16(b) of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C.A. § 216(b), to recover from defendant minimum wages, overtime compensation, an equal additional amount as liquidated damages, court costs, and a reasonable attorney's fee. On April 19, 1947, defendant filed motion to dismiss the complaint on the ground that it failed to state a claim upon which relief could be granted under the Act. After the passage of the so-called Portal-to-Portal Act of 1947, 29 U.S.C.A. § 251 et seq., defendant amended its motion to dismiss, for the further reason that under section 2(a), (b), and (d) of this Act the complaint failed to state requisite jurisdictional facts.

It should be kept in mind that plaintiffs' suit is predicated solely on the Fair Labor Standards Act of 1938, as amended, 29 U.S.C.A. § 201 et seq. (herein referred to as "the Act"), and that the question presented is whether or not the complaint states a claim upon which relief could be granted under that Act. In considering defendant's motion to dismiss, the court must assume the truth of all material and well pleaded allegations of fact. However, the motion does not admit mere conclusions of law, or inferences or conclusions of fact not supported by allegations of specific facts upon which the inferences or conclusions rest. Weeks v. Denver Tramway Corporation, 10 Cir., 108 F.2d 509, 510; 5 Cyclopedia of Federal Procedure, § 1593.

Section 3(e) of the Act defines "employee" as "any individual employed by an employer," and section 3(g) defines "employ" as including "to suffer or permit to work." In order to state a valid claim against defendant, plaintiffs must allege specific facts showing that they were employees of the defendant and that it was their employer, within the meaning of those terms as used in the Act. Merely alleging the conclusions that plaintiffs were employees and that defendant was their employer is not sufficient.

In their complaint plaintiffs alleged that they were inmates of the State prison of southern Michigan and were serving sentences imposed by the courts of that State; that they were subject to the direction and control of the Michigan corrections commission[1], which has jurisdiction of the Michigan prison industries; and that they and other inmates were assigned by prison officials to work in the prison stamping plant upon parts and assemblies of shell casings, which were to be furnished by defendant to the ordnance division of the war department of the United States government. They alleged that about March

---

[1] Act No. 210, Pub.Acts Mich.1935, as amended, Stat.Ann. § 28.1521 et seq., and Act No. 255, Pub.Acts Mich.1937, Stat.Ann. § 28.2071 et seq.

18, 1944, the defendant entered into a contract with the Michigan prison industries and the warden of the prison whereby the defendant engaged the services of certain prison inmates, to be selected by prison officials, for work in the prison stamping plant in connection with the machining and assembling of parts of shell casings; that the contract provided for the use of the machinery in the prison stamping plant; and that defendant was to furnish all materials, including dies, fixtures, and paint, and transport the materials to and from the prison. They alleged that under the contract defendant agreed to pay the Michigan prison industries "a set sum per day for every inmate assigned and working thereunder"; that defendant was to pay for the use of the machinery in the prison stamping plant and for heat, light, power, and other items furnished, including the use of the presses in the stamping plant owned by the Michigan State highway department. They alleged that the superintendent, general foreman, night superintendent, paint foreman, superintendent of the tool room, and other employees of the prison industries (all of whom were not inmates and not involved in the present suit) were to be paid by the defendant for their services in supervising the inmates in their work in the stamping plant; and that these employees of the prison industries were under the supervision and direction of defendant. Plaintiffs further alleged that they were employed six days a week in the making, machining, and assembling of the shell casings; that for their services prison authorities credited their respective accounts with an average sum of 52½ cents for each 12-hour shift; and that their employment in connection with the manufacture of the shell casings continued until approximately two weeks after the cessation of hostilities in World War II. They further alleged that the contract between defendant and the prison industries and the warden of the prison was in violation of Act No. 210, Pub.Acts Mich.1935, as amended, in that it provided for the hiring or leasing of prison labor for the profit of a private corporation, contrary to the provisions of section 5 of that Act.[2] They alleged that the shell casings upon which they worked in the prison stamping plant were not for use or consumption in the penal, charitable or custodial institutions of the State or by the Federal government or agencies thereof, but were for the private and corporate profit of the defendant. The plaintiffs further alleged, merely as a conclusion, "that in truth and in fact and in law, the plaintiffs were employees, the defendant was the employer, and that the plaintiffs were in the employ of the defendant within the meaning of the Act." It was alleged that the sum of one million dollars was due and owing to the plaintiffs and other prison inmates similarly situated, for unpaid compensation, unpaid overtime compensation, and liquidated damages.

In summary, the allegations of the complaint show that plaintiffs were inmates of a State prison; that they were under the sole control, direction, and supervision of the Michigan prison industries and prison

---

[2] Section 5 of the 1935 Act was amended by Act No. 215, Pub.Acts Mich.1943, Stat.Ann. § 28.1525, effective April 20, 1943, which provides in part: "From and after 60 days after this act shall become law it shall be unlawful to sell or exchange or to offer for sale or exchange, or to purchase any prison products * * * otherwise than for use or consumption in the penal, charitable and/or other custodial institutions of this state or for departments of this state, or political subdivisions thereof, *or the federal government or agencies thereof*, or otherwise as specifically provided in this act; nor shall the labor of prisoners be sold, hired, leased, loaned, contracted for or otherwise used for private or corporate profit or for any other purpose than the *construction, maintenance or operation of public works, ways, or property as directed by the governor*; * * * Provided, That the provisions of this section with respect to political subdivisions of this state or the federal government or agencies thereof shall be operative only until March 1, 1945, or until the termination of the state of war now existing between the United States and each of the various other nations or countries of the world with which this country is now at war or with which this country may be at war prior to the cessation of the present hostilities, in case such state of war shall terminate prior to March 1, 1945."

officials[3]; that defendant contracted with the prison industries but that it had no contractual relationship or personal dealings with the plaintiffs; that there was neither promise nor contemplation of compensation from defendant; and that defendant agreed to pay the Michigan prison industries a fixed sum per day for every inmate assigned to work in the prison stamping plant in connection with the manufacture of shell casings to be used by the war department. The complaint does not allege or intimate that there was any collusive arrangement between defendant and Michigan prison industries for the intent and purpose of evading the law of the State or the application of the Act.

It is clear that the labor of the plaintiffs as inmates of the State prison belonged to the State of Michigan, and they concede in effect that they could be lawfully employed only by the State. However, in connection with their claim that the contract between defendant and the prison industries was void, plaintiffs contend that there was an implied obligation on the part of defendant to pay them for their services, on the theory that one who engages the services of prisoners under an illegal contract is obligated to pay the reasonable value of their services. Therefore, plaintiffs conclude that they became employees of defendant within the meaning of the Act. In support of this conclusion plaintiffs rely upon Walling v. American Needlecrafts, Inc., 6 Cir., 139 F.2d 60, 63, where the court, citing Bowman v. Pace Company, 5 Cir., 119 F.2d 858, 860, said:

" 'If one has not hired another expressly, nor suffered or permitted him to work under circumstances where an obligation to pay him will be implied, they are not employer and employee under the Act.' There would seem to follow from this negation, an affirmation that if one does suffer or permit another to work under circumstances where an obligation to pay him will be implied, they are employer and employee under the Act."

In other words, plaintiffs argue that defendant suffered or permitted them to work under circumstances whereby an obligation to pay them the reasonable value of their services should be implied and that, under the above-quoted language of the Needlecrafts case, the relationship of employer-employee under the Act was thereby created. Plaintiffs' theory of recovery is based squarely on their assumption that the contract between defendant and the prison industries was void. That assumption of invalidity may well be questioned, as the contract provided for the manufacture and assembling of shell casings to be used by the Federal government in its war effort, and it would appear that such a contract was contemplated by Act 215, Pub.Acts Mich.1943, hereinbefore quoted. However, assuming, but without determining, that the contract was void, it does not follow that plaintiffs thereby became the employees of the defendant within the meaning of the Act. In discussing the subject of the liability of a lessee of prison labor where the prisoners are illegally compelled to perform such labor, it is stated in 41 Am. Jur. p. 908, § 34, as follows:

"It seems agreed that a lessee of convict labor who knowingly receives the services of a convict illegally compelled to perform such labor is guilty of a tort toward such convict, for which he is liable. The rule applies where the sentence is illegal on account of want of jurisdiction, or where the commitment is void for any other reason, or where the prisoner is detained after the expiration of his sentence or after being pardoned. The authorities are not agreed as to whether the contractor is bound at his peril to know whether the prisoner is lawfully employed by him, some holding that he is presumed to know the law and is therefore bound to know whether the employment is legal, while others hold that a contractor is liable only when he in fact knows of the illegality, since he is not bound at his peril to ascertain it. There is also a difference of opinion in the cases as to whether the convict can waive the tort and recover on an implied contract to

---

[3] Comp.Laws Mich.1929, § 17580, Stat. Ann. § 28.1407: "All convicts * * * shall as far as practicable be kept constantly employed at hard labor at an average of not less than ten (10) hours a day, Sundays excepted."

pay him the reasonable value of his labor. On this point some authorities hold that the action may be maintained on account of the benefit received by the lessee, while others hold that it will not lie in any case."

■ It should be noted from the above-quoted authority that the courts are in disagreement as to whether a prisoner may waive the tort arising from his illegal employment and recover on an implied contract to pay him the reasonable value of his services. Furthermore, the rule permitting a prisoner to recover for his services arose out of cases where his employment was held to be illegal because the sentence he was serving, when compelled to work, was void, or where he had been detained and compelled to work after expiration of his sentence or after being pardoned. No one of these factors is present in the case at bar. However, assuming that one who engages the services of prisoners under an illegal contract is guilty of a tort and that the prisoners can waive the tort and recover on an implied contract to pay them the reasonable value of their services, it does not follow that an employer-employee relationship is thereby created within the meaning of the terms of the Act. The doctrine of quasi contract, which might permit the prisoners to recover under such circumstances, is based solely on a legal fiction and rests on the equitable principle that one should not be allowed to enrich himself at the expense of another. Cascaden v. Magryta, 247 Mich. 267, 225 N.W. 511. To invoke this legal fiction to prevent an unjust enrichment would seem proper. However, to invoke it in the present case for the sole purpose of labelling the plaintiffs as "employees" of defendant under the Act would extend the doctrine and legal fiction beyond reason.

■ The sole question before the court is whether or not the complaint states a claim against defendant upon which relief could be granted. That is, does it state facts showing that plaintiffs were employees of defendant within the meaning of the Act? In considering the question of who are employees under the Act, the court said in Walling v. Portland Terminal Co.,

330 U.S. 148, 150, 151, 67 S.Ct. 639, 640, 91 L.Ed. 809:

"In determining who are 'employees' under the Act, common law employee categories or employer-employee classifications under other statutes are not of controlling significance. See N. L. R. B. v. Hearst Publications, 322 U.S. 111, 128, 129, 64 S. Ct. 851, 859, 88 L.Ed. 1170."

■ In Helena Glendale Ferry Co. v. Walling, 8 Cir., 132 F.2d 616, 620, in discussing the terms "employ" and "employee," the court said:

"The Act defines an employee as 'any individual employed by an employer', and the word 'employ' as used in the Act includes 'to suffer or permit to work.' But since the obvious purpose of the Act is to establish minimum wages and maximum hours, the words last quoted can not be interpreted to include as an employee one over whose hours of labor the employer has no control, and to whom the employer is under no obligation to pay wages."

In discussing the terms of the Act, the court further said in Walling v. Portland Terminal Co., supra, 330 U.S. at page 152, 67 S.Ct. at page 641, 91 L.Ed. 809:

"The definition 'suffer or permit to work' was obviously not intended to stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another. * * * The Act's purpose as to wages was to insure that every person whose employment contemplated compensation should not be compelled to sell his services for less than the prescribed minimum wage."

■ Furthermore, one does not become an employer simply because he receives the ultimate benefit of the services of an employee of a third party. In Maddox v. Jones, D.C., 42 Supp. 35, 40, 42, the court said:

"While the definition of 'employ' is 'to suffer or permit to work', this cannot be construed to mean that an employee hired by a third party, the product of his labor being ultimately used for the benefit of the defendant, is employed or is 'suffered or

permitted to work' by the defendant alleged to have ultimately received the product upon which he labored. Such an employee may hold the third party responsible, but not the defendant. * * *

"The Fair Labor Standards Act was designed, amongst other things, to improve labor conditions with reference to wages and hours and add to the welfare generally of those who work in industry engaged in interstate commerce, as well as to lighten the burdens of that commerce by a more efficient and expeditious flow of goods. Certainly interstate commerce would become hazardous if not impossible, if the manufacturer or every industry in interstate commerce is held to be responsible for the conduct or all the sins of omission and commission of those from whom they procure the necessary material for the manufacture of goods placed on the market. It is difficult to believe that Congress intended to place such a burden upon the industries of the nation, and if so, in passing the Fair Labor Standards Act, we must believe that it would have been more specific and definite in writing language designed to effect that purpose. * * *

"It is difficult to conceive instances wherein an industrial plant, through its management 'suffers or permits to work' within the meaning of the Act, employees with whom the plant has no contractual relationship as employer and employee or as master and servant. It is a matter of common knowledge that thousands of industries contract for services or material to be furnished by or through independent contractors thousands of miles away, or even on the premises of the plant or industry which receives the ultimate benefit of the labor performed by the employees of the contractor. Those industries, in a sense, 'suffer or permit' such employees to work, but not within the sense or meaning of 'suffer or permit' as used in the Fair Labor Standards Act.

"This court is of the opinion that Congress did not intend to hold the beneficiary industry or plant responsible for the standards and payment of wages, or the wrongs and errors committed by independent contractors in dealing with their employees.

If the lawmakers had thought it feasible or conducive to the welfare of labor and to interstate commerce, to put such responsibilities on a lumber manufacturer, a furniture plant, a paper mill, a steel maker, a shipbuilder, or even the merchants who sell and ship goods in interstate commerce, they would have so provided in plain and definite language. Not doing so, the only conclusion is that such was not intended and has not yet been done."

In Walling v. Sanders, 6 Cir., 136 F.2d 78, appellee was a wholesale beer dealer. The commodity it sold was delivered to retailers in trucks owned by the appellee. The trucks were in charge of appellee's salesmen who covered definite routes each day and sold to retailers such quantity as they required. The salesmen generally employed drivers to help deliver the beer and pick up empty cases and bottles for return to appellee's warehouse. The salesmen paid the drivers and exercised complete control over them. The question before the court was whether or not the drivers were "employees" of appellee within the meaning of the Act. Holding that they were not, the court said, 136 F.2d at page 81:

"We are not persuaded that the drivers are in the employ of the appellee rather than of its salesmen. The salesmen themselves hire the drivers and pay them out of the compensation received from the distributor. The drivers are a convenience to the salesmen. They may, if they wish, drive their own trucks, load and unload them. It is true that in arriving at a basis for compensating salesmen there have been times when the salesmen's compensation of $35 per week was designated as being made up of $25 for salary and $10 for expenses. This did not, however, preclude the salesmen from dispensing with drivers or paying more, as sometimes was done. Such designation, however, is pointed to by the administrator as an important criterion to show that the driver was the employee of the appellee. It does not follow. One might as logically urge that the porter who carries the traveling salesman's sample case from train to taxicab, or the taxicab driver who transports him to his hotel,

are employees of his principal merely because the salesman puts such out-of-pocket items upon his expense account and is for them reimbursed.

"The usual test by which, in common experience, men determine the employer, is to ascertain who has authority on his own account to 'hire and fire.' But the administrator urges that the term 'employe' as here used is not a word of art but one carefully defined by the statute. He refers to § 3(e) of the Act which defines 'employee' as any individual employed by an employer, and § 3(g) which defines 'employ' to mean 'to suffer or permit to work.' Since the appellee suffers or permits drivers to work for its salesmen, ipso facto they work for it. This likewise does not follow. In so broadly defining the word 'employ' Congress undoubtedly had a purpose to relieve complainants of the necessity of proving a contract of employment. The administrator desires us to construe employees so as to include not only those who work for an accused employer, but also those who work for anybody else. Manifestly this would encompass all employed humanity."

In Dugas v. Nashua Mfg. Co., D.C., 62 F.Supp. 846, the defendant, a manufacturer of war materials, entered into an arrangement with the police commission of the city of Nashua to furnish defendant with armed guards. The commission hired the guards and furnished their badges, flashlights, night sticks, revolvers, and other equipment, and the guards were paid directly by the commission. The defendant reimbursed the commission for all wages paid to the guards plus a service charge of fifty cents per man per week. The guards subsequently brought suit against defendant under the Act on the theory that they were employees of defendant as they were "suffered" or "permitted" to perform their services for defendant upon the premises of defendant. Holding that the relationship of employer-employee did not exist

between the parties, the court approved the following language of Schroepfer v. A. S. Abell Co., D.C., 48 F.Supp. 88, 94, affirmed 4 Cir., 138 F.2d 111, certiorari denied 321 U.S. 763, 64 S.Ct. 486, 88 L.Ed. 1060, rehearing denied 322 U.S. 770, 64 S.Ct. 1149, 88 L.Ed. 1595:

"The statutory definitions of 'employer', 'employee', and 'employ' are in very general terms, and should be understood in 'their natural sense, and intended to describe the conventional relation of employer and employee'. * * * The Act thus contemplates (a) a situation in which the employer, expressly or impliedly, agrees to pay a certain sum to the employe, and (b) has the control and determination of the hours of work by the employe." See also Lewis v. Florida Power & Light Co., D.C., 69 F.Supp. 23.

In pursuance of the foregoing authorities the court concludes that the complaint in the present case fails to allege facts showing that plaintiffs were employees of the defendant within the meaning of the words "employ" and "employee" as used in the Act. In fact, the complaint affirmatively shows that plaintiffs were employees of the Michigan prison industries and not of the defendant. In view of this conclusion it is unnecessary to determine the question of the validity of the contract between the defendant and the prison industries. Nor is it necessary to determine what the common-law rights of the plaintiffs would be in the event the contract was held to be void.

Having concluded that the complaint fails to show that plaintiffs were employees of defendant within the meaning of the Act, it is unnecessary to discuss the obvious infirmities of the complaint under section 2(a), (b), and (d) of the Portal-to-Portal Act of 1947.[4] Defendant's motion to dismiss the complaint is granted, and an order of dismissal will be entered accordingly.

---

[4] See Boerkoel v. Hayes Mfg. Corporation, D.C., 76 F.Supp. 771.