**Louis CARTER, Plaintiff-Appellant,**

v.

**DUTCHESS COMMUNITY COLLEGE, et al., Defendants-Appellees.**

**No. 778, Docket 83–2053.**

United States Court of Appeals, Second Circuit.

Argued Feb. 17, 1984.

Decided May 14, 1984.

---

Claudia J. Flynn, New York City (Parker Auspitz Neesemann & Delehanty P.C., New York City, on the brief), for plaintiff-appellant.

Stephen J. Wing, County Atty., Poughkeepsie, N.Y., for defendants-appellees Dutchess Community College and F. Kennon Moody.

Nancy Miller Lerner, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen. of State of N.Y., Melvyn R. Leventhal, Deputy First Asst. Atty. Gen., Barbara Butler and Brenda S. Spears, Asst. Attys. Gen., New York City, on the brief), for defendants-appellees Walter Chattman and Patrick J. Fish.

Before TIMBERS, KEARSE and PIERCE, Circuit Judges.

TIMBERS, Circuit Judge:

This is an appeal from a summary judgment entered January 11, 1983 on the motions of defendants in the Southern District of New York, Robert L. Carter, *District Judge*. The court granted the motions based on the report and recommendation of Magistrate Naomi Reice Buchwald, dated December 13, 1982. The magistrate recommended that, because plaintiff Louis Carter, as a state inmate, is under the "ultimate control" of the New York State Department of Correctional Services, he cannot be an employee of defendant Dutchess Community College within the meaning of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 et seq. (1982). We reverse and remand.

I.

At the time this § 1983 action was commenced on February 25, 1981, Carter was an inmate at the Fishkill Correctional Facility (FCF) in New York. He alleged that he was participating in a program at FCF conducted by Dutchess Community College (DCC), pursuant to which, in conjunction with the several college level courses offered by DCC to inmates at FCF, DCC "employ[ed] several inmates in [the] institution (using only those who have actually graduated from a four-year college program) to act as teaching assistants to our regular staff." In his amended complaint filed December 5, 1981, Carter alleged that

he was compensated at a level well below the federal minimum wage, in violation of the FLSA.

The origins of the inmate-teaching assistant program at FCF can be traced to a letter dated March 25, 1978 from defendant F. Kennon Moody, a former Coordinator of Inmate Education at DCC, to defendant Walter Chattman, who at the time was the Director of Educational Services for the New York State Department of Correctional Services (DCS). In that letter Moody first proposed the program. The duties of the inmate-teaching assistants would include meeting with DCC teachers, attending class meetings, and tutoring inmate-students outside of classroom hours. Moody requested the permission of DCS to supplement the inmates' prison wages so that a total day's salary would amount to between $3 and $4, five days a week. Moody also suggested that DCC send a check on a monthly basis to the prison's Office of Inmates Accounts to cover the supplementary wages.

The inquiry regarding the payment of supplementary wages to inmates was referred to defendant Patrick J. Fish, an attorney with DCS. According to Chattman's memorandum of April 20, 1978 to a deputy superintendent of programs, Fish advised that he saw "no legal impediment" to the supplementary compensation plan.

DCC then conducted a screening process to find inmates it considered to be qualified for the teaching assistant positions. Eligibility criteria were determined solely by DCC. DCC then submitted to DCS a list of inmates who it recommended be permitted by DCS to participate in the teaching assistant program. It is not clear from the record how many inmates were proposed by DCC, and consequently how many, if any, were rejected by DCS. What is clear is that Carter was among the eight inmates selected during the Fall of 1980. He was selected to conduct twenty tutorial classes in business math, all of which were held within the prison. Each session lasted 2½ hours. He was paid a total of $60, which breaks down to $3 per class, or $1.20 per

hour. The federal minimum wage at the time was $3.10 per hour.

At some point during or after his participation in the teaching assistant program, Carter learned that student tutors at the campus of DCC earned at least the federal minimum wage, which DCC was required to pay by law. On February 4, 1981, Carter wrote letters to the Director of Education at DCS and the Director of Financial Aid at DCC, inquiring about the disparate compensation scheme. He referred in both letters to the fact that the current Coordinator of Inmate Education at DCC had told Carter that DCS did not permit DCC to pay any more than $3 per day.

Carter received a prompt response on February 10 from the DCC Director of Financial Aid, Daniel Sistarenik, who informed Carter that indeed DCS did restrict the maximum amount of compensation that could be paid to the inmate tutors. Sistarenik advised Carter to state his concerns to DCS. By the time Carter commenced his § 1983 pro se action on February 25, he had received no response from DCS. He attached the response he finally did receive, dated April 9, to his affidavit in opposition to defendants' motions to dismiss. This letter told Carter to direct his concerns to DCC.

In his pro se complaint, Carter named DCS and DCC as defendants. He alleged that he had been denied the equal protection of the laws, in violation of the Fourteenth Amendment, and had been subjected to involuntary servitude in violation of the Thirteenth Amendment. He sought back wages in amount of $107.50, plus interest, punitive damages in amount $150,000, and an injunction requiring defendants to begin paying all tutors the same compensation.

After DCS was dismissed from the action by an order entered June 17, 1981, Carter filed an amended complaint on November 23, 1981. The amended complaint added the individual defendants Moody, Chattman and Fish and alleged that defendants' actions violated the labor laws by compensating him at a rate less than the minimum wage.

On July 20, 1982, defendants DCC and Moody filed a motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6). On July 21, 1982, defendants Chattman and Fish filed a similar motion to dismiss. The motions were referred to the magistrate in accordance with a prior order referring the entire case to her.

In her well reasoned report and recommendation to Judge Carter, the magistrate rejected both constitutional arguments made by plaintiff. These arguments are not pressed on appeal.

In stating the alleged FLSA violation, the magistrate framed the issue as follows:

"In order to determine whether such an employment relationship exists the court must look to the 'economic reality' of the situation and determine whether DCC has 'ultimate control' over plaintiff."

The magistrate then applied the following standard to the facts before her:

"Although DCC does have discretion in the selection of inmates for positions in the teaching assistant program, these inmates nevertheless remain under the supervision and control of prison officials. It was the prison administrators that initially approved the program, and inevitably it is these same officials who retain the authority to disqualify an inmate or discontinue the program as they see fit. The fact that DCC was responsible for initiating the program and paying the inmates' wages does not compel a contrary result. Rather, the college's control over the inmates is 'qualified,' that is, 'subject to the ultimate control of prison administrators.' ... In short, inmates who participate in the teaching assistant program nevertheless retain their status as inmates under the control of New York State's correctional facilities, rather than becoming 'employees' of DCC."

In a footnote, the magistrate added that it was "unlikely that Congress intended that the FLSA's minimum wage protection be extended to prisoners." She recommended that defendants' motions, which

she correctly treated as motions for summary judgment because the parties had conducted some discovery and relied on matters outside the pleadings, be granted.

The magistrate's report and recommendation was accepted and adopted by Judge Carter as the opinion of the court. From the judgment entered thereon, plaintiff has taken this appeal on which he has been represented by competent counsel. He argues (1) that the court applied an improper legal standard under the FLSA; (2) that defendants failed to sustain their burden under Rule 56; (3) that the court resolved factual disputes against him, the non-moving party; and (4) that the court did not allow sufficient discovery. For the reasons set forth below, we reverse the judgment of the district court and remand the case to that court for further proceedings.

## II.

In our view, the issues in this case really boil down to one question: whether prisoners ever may be considered employees for the purposes of the minimum wage provisions of the FLSA. We frame the question in this way because, upon close examination, the only issue of fact considered material by defendants in their moving papers was Carter's inmate status. Moreover, the practical effect of the district court's decision is an absolute preclusion of FLSA coverage for prisoners. The court acknowledged that DCC exercised some control over the inmate-teaching assistants, but held that, since prison officials "inevitably" had "ultimate control" over the inmates, DCC could not be considered to be the inmates' employer.

█ It is common ground that courts, in determining whether an employment relationship exists for purposes of the FLSA, must evaluate the "economic reality" of the relationship.[1] Such an evaluation was first applied in the FLSA context in *Goldberg v.*

*Whitaker House Cooperative, Inc.,* 366 U.S. 28 (1961). The "economic reality" test since has been refined and now is understood to include inquiries into:

> "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."

*Bonnette v. California Health and Welfare Agency,* 704 F.2d 1465, 1470 (9 Cir. 1983). The power to control a worker clearly is a crucial factor in determining whether an employment relationship exists. The district court here was correct in considering it.

The point at which we believe the court below erred was in giving undue weight to the control factor alone. More specifically, the court created a two-tiered analysis of control, recognizing that DCC had "qualified control" and that DCS had "ultimate control". Based on this distinction, as in *Alexander v. Sara, Inc.,* 559 F.Supp. 42 (M.D.La.), *aff'd per curiam,* 721 F.2d 149 (5 Cir.1983), the court here held that Carter was not an employee within the meaning of the FLSA.

█ We do not agree that an entity's control over a worker must be "ultimate" in order to justify a finding of an employer-employee relationship. The statute is a remedial one, written in the broadest possible terms so that the minimum wage provisions would have the widest possible impact in the national economy. It runs counter to the breadth of the statute and to the Congressional intent to impose a qualification which permits an employer who exercises substantial control over a worker, but whose hiring decisions occasionally may be subjected to a third party's veto, to escape compliance with the Act. Indeed, in *Falk v. Brennan,* 414 U.S. 190 (1973), the Su-

---

1. A case by case analysis is required because the statute's definitions are stated in only the broadest terms. Section 3(e) defines "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e) (1982). "Employ" is defined as

"to suffer or permit to work." *Id.* § 203(g). An "employer" is one who acts "directly or indirectly in the interest of an employer in relation to an employee." *Id.* § 203(d).

preme Court held that a real estate management partnership, for FLSA minimum wage purposes, was an employer of maintenance workers at various apartment complexes. The workers were hired and supervised by the partnership, but at all times were considered employees of the owners of the apartment buildings. The Court referred to the amount of control exercised by the partnership over the workers as "substantial". The fair inference is that ultimate control was exercised by the apartment owners. It follows that the fact that control over a worker may be qualified is not a sufficient factor, in and of itself, to place an employment relationship beyond the scope of the FLSA.

■ Defendants argue, however, and the district court essentially agreed, that in the specific area of inmate labor, the ultimate control exercised by prison officials over inmates is a dispositive consideration that precludes a finding of an employee-employer relationship between an inmate and some outside entity. Aside from language in *Alexander v. Sara, Inc., supra,* defendants claim support from the stated purposes behind the FLSA. The argument here begins by pointing out that the FLSA was enacted to improve the living conditions, bargaining strength vis-a-vis employers, and general well-being of the American worker. 29 U.S.C. § 202 (1982). In light of that, they contend that the FLSA has no application to imprisoned persons such as Carter, whose living conditions are determined as a matter of state policy, and who have no need for bargaining strength since their right to work in the first place is a matter of legislative grace.

Despite the surface appeal of this logic, we reject it for three reasons. First, there are purposes behind the FLSA other than those set forth above, among which is the establishment of minimum standards in the workplace. *Mitchell v. Robert DeMario Jewelry, Inc.,* 361 U.S. 288 (1960). This results in the elimination of unfair competition, not only among employers, but also among workers looking for jobs. We believe that courts should refrain from exempting a whole class of workers, based on technical labels, from the coverage of the FLSA, because such action would have the potential for upsetting the desired equilibrium in the workplace.

Second, in § 13 of the FLSA, 29 U.S.C. § 213 (1982), Congress has set forth an extensive list of workers who are exempted expressly from FLSA coverage. The category of prisoners is not on that list. It would be an encroachment upon the legislative prerogative for a court to hold that a class of unlisted workers is excluded from the Act. Congress must be presumed to be aware of and to approve of the use by the courts of the economic reality test, which involves a case-by-case factual analysis. We decline defendants' invitation to depart from that analysis here.

Third, the cases relied upon by defendants—even those with language suggesting a bright-line rule of exemption for prisoners—in fact have undertaken a particularized inquiry into the facts of each case. In *Alexander v. Sara, Inc., supra,* a district court in Louisiana described in detail the blood plasma program in the Louisiana State Penitentiary at Angola, at which the plaintiffs worked. In ruling that the inmates were not employees of the defendant (an outside company), the court acknowledged that the facts were nearly identical to those of another Louisiana district court case, *Hudgins v. Hart,* 323 F.Supp. 898 (E.D.La.1971). While the court in *Alexander* did state that FLSA coverage for prison inmates was not contemplated by Congress, that strikes us as dictum in view of the factual analysis of the case.

Similarly, in *Sims v. Parke Davis & Co.,* 334 F.Supp. 774 (E.D.Mich.), *aff'd per curiam,* 453 F.2d 1259 (6 Cir.1971), *cert. denied,* 405 U.S. 978 (1972), the court carefully analyzed all the facts of the case before concluding that the economic reality of the inmate-manufacturer relationship was that it was not employment, and not covered by the FLSA. *Accord, Huntley v. Gunn Furniture Co.,* 79 F.Supp. 11 (W.D.Mich.1948).

We hold that it was error to have granted defendants' motions on the basis of "ul-

timate control"—whether viewed as one factor of the economic reality test or as an independent ground. A full inquiry into the true economic reality is necessary. We hold only that an inmate may be entitled under the law to receive the federal minimum wage from an outside employer, depending on how many typical employer prerogatives are exercised over the inmate by the outside employer, and to what extent.

### III.

There remains to be determined whether, based on the record before us, we can affirm the summary judgment in favor of defendants on the ground that the economic reality test discloses no employment relationship between Carter and DCC. We can do so only if there is no genuine issue as to any material fact, the burden of establishing that being on defendants as the moving parties. *American International Group, Inc. v. London American International Corp.*, 664 F.2d 348, 351 (2 Cir.1981). Any ambiguities must be resolved in favor of the non-moving party. *Id.*

In applying the economic reality test, the material facts are whether the alleged employer could hire and fire the worker, control work schedules and conditions of employment, determine the rate and method of payment, and maintain employment records. Carter's amended complaint alleges that he was employed by DCC pursuant to a proposal made by Moody of DCC to Chattman of DCS. The complaint also alleges that DCC was to pay the inmate-tutors directly, and that the wages eventually paid to Carter were substantially below the minimum wage and the compensation paid to on-campus student tutors. Attached to the complaint were Moody's letter (which says, "We propose to employ several inmates"), a response from the deputy superintendent of program services at Green Haven,[2] a letter from the same deputy superintendent to Chattman asking for advice on the legality of DCC's paying inmates, and Chattman's answering memorandum that, on the advice of counsel, there was no

legal impediment to DCC's paying the inmates.

In support of the motion to dismiss by DCC and Moody, there was attached an affidavit by the Chief Assistant County Attorney for Dutchess County. His affidavit did not address any of the facts that are material under the economic reality test. His ground for urging dismissal was solely that Carter was an inmate at a state prison. We have held above that that is an insufficient reason to have granted summary judgment for defendants.

In support of the motion to dismiss by Chattman and Fish, there was attached an affidavit by an Assistant Attorney General. His affidavit likewise was devoid of any material facts and rested solely on the fact that Carter was an inmate. In paragraph 10, the affidavit stated as a conclusion that "[i]nmates in the New York State Correctional System are not entitled to receive minimum wage." Attached to the affidavit were the Moody letter, the letter to Chattman from the deputy superintendent of program services, and Chattman's memorandum relaying counsel's advice, all of which had been attached to the complaint. In addition, there was attached a certificate of approval from the office of the Commissioner of Correctional Services setting forth daily allowance rates paid by the prison system to the inmates. The certificate did not disclose that money paid to inmates by outside "employers" was subject to a DCS-imposed maximum.

In short, defendants' affidavits simply failed to demonstrate that all material facts under the economic reality test were undisputed.

Carter filed opposing papers, including an affidavit. He restated the facts as originally alleged in the complaint. He added, however, that he had received a letter from a Petrita Hernandez, dated April 9, 1981 (after the filing of Carter's original complaint). This letter was in response to Carter's letter to DCS of February 4, 1981 which had been attached to Carter's origi-

---

**2.** After commencement of the action, Carter was transferred out of the Fishkill Correctional Facility.

nal complaint. In her letter, Ms. Hernandez, who was Director of Education at DCS, informed Carter that "this issue [regarding compensation for tutoring] should be addressed to Dutchess Community College for whom you tutor." This letter certainly suggests a genuine issue as to a very material fact, namely, who determines the rate of pay for inmate-tutors. While it is the position of defendants that DCS imposes a maximum on money payable to inmates, Ms. Hernandez' letter at least gives rise to a contrary inference.

■ Despite the sparse record before us, this case strikes us as quite different from the typical case in which prisoners seek FLSA coverage. *E.g., Wentworth v. Solem,* 548 F.2d 773 (8 Cir.1977) (per curiam) (inmate working in prison bookbindery not an employee of the state prison); *Alexander v. Sara, Inc., supra* (no contractual relationship between inmates and outside company; "compensation" paid to State of Louisiana, not to inmates; no right on part of outside company to reject an inmate assigned to work in the plasma program); *Sims v. Parke Davis & Co., supra* (no contractual relationship between inmates and outside company; outside company relinquished to prison officials the normal rights of an employer to determine whether more or less manpower was needed, who the workers would be, and to discharge those found unsatisfactory); *Hudgins v. Hart, supra* (no contractual relationship between outside company and inmates; prison officials assigned inmates to work for defendant; money was sent to prison, which decided how much to pay the inmates); *Huntley v. Gunn Furniture Co., supra,* (same; *sole* control was with prison officials).

In the instant case, accepting the facts and all reasonable inferences favorable to Carter as the non-moving party, DCC made the initial proposal to "employ" workers; suggested a wage as to which there was "no legal impediment"; developed eligibility criteria; recommended several inmates for the tutoring positions; was not required to take any inmate it did not want; decided how many sessions, and for how long, an inmate would be permitted to tutor; and sent the compensation directly to the inmate's prison account.

While perhaps not the full panoply of an employer's prerogatives, this may be sufficient to warrant FLSA coverage. We do not hold one way or the other on that ultimate issue. We hold only that Carter has demonstrated genuine issues regarding material facts as to whether he is covered by the FLSA, and we emphatically hold that the fact that he is a prison inmate does not foreclose his being considered an employee for purposes of the minimum wage provisions of the FLSA.

The judgment of the district court is reversed, and the case is remanded to that court for further proceedings consistent with this opinion, including appropriate discovery proceedings.[3]

Costs to appellant on this appeal.

The mandate shall issue forthwith.

Reversed and remanded.

---

**3.** Since the district court did not reach the issues, and because the record before us is inadequate, we do not pass on the merit of defendants' arguments regarding the Eleventh Amendment, qualified immunity or the exemption from FLSA coverage based upon *National League of Cities v. Usery,* 426 U.S. 833 (1976).